## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LASHONDA BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-16-S-1214-NE** |
| | ) | |
| **HUNTSVILLE CITY BOARD** | ) | |
| **OF EDUCATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND FINAL JUDGMENT

Plaintiff, LaShonda Brown, commenced this action against her former employer, the Huntsville City Board of Education. She asserts claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and race discrimination under 42 U.S.C. §§ 1981 and 1983.[1] The case presently is before the court on defendant's motion for summary judgment.[2]

Plaintiff, who appears *pro se*, did not submit either a responsive brief or an evidentiary submission in opposition to defendant's motion. Even so, the court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One*

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 13.

*Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004). Accordingly, upon consideration of the pleadings, defendant's brief, and the evidentiary submission, this court concludes for the following reasons that summary judgment is due to be entered in favor of defendant.

## I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. FACTUAL BACKGROUND

Plaintiff, LaShonda Brown, is an African-American female and a former employee of the Huntsville City Board of Education. She was hired in August of 1999, and assigned to Westlawn Middle School as a social studies teacher.[3] She was transferred to Huntsville Middle School during 2008, due to a reduction in force within the school system.[4] She served as a social studies teacher in that school from

---

[3] Doc. no. 15-1 (Plaintiff's Deposition), at 32.

[4] *Id.* at 34-35; *id.* (Exhibit 5 to Plaintiff's Deposition), at ECF 83. **Note**: "ECF" is an acronym formed from the initial letters of the name of a case filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). *See The Bluebook, A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010). When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters ECF.

then through the end of the 2012-13 academic year. For reasons that are discussed below, plaintiff then transferred to Butler High School; and, at the end of the 2013-14 academic year, to Grissom High School. She resigned to accept employment in another school system during November of 2015.

## A. Plaintiff's Applications for Administrative Positions

While teaching social studies at Huntsville Middle School, plaintiff applied for various administrative positions within the school system.[5] For example, she applied for positions as an elementary school Principal and Assistant Principal during July of 2009, and a middle school Assistant Principal position in July of 2011, but she was not selected for any of those positions.

Plaintiff applied for positions as a middle school and high school Assistant Principal during July of 2012.[6] She was interviewed by Dr. Barbara Cooper,[7] Deputy Superintendent of the City School System, but Dr. Cooper did not recommend plaintiff for either of those positions, or any other administrative positions for which plaintiff later applied.[8] The Board did not fill the middle school Assistant Principal

---

[5] Doc. no. 15-4 (Exhibit A to Debord Affidavit), at ECF 10.

[6] *Id.*

[7] Doc. no. 15-3 (Cooper Affidavit) ¶ 6. Plaintiff testified in deposition that Dr. Cooper did not interview her, but merely spoke to her on the telephone on one occasion. Doc. no. 15-1 (Plaintiff's Deposition), at 171.

[8] Doc. no. 15-1 (Plaintiff's Deposition), at 55-56. Plaintiff testified in her deposition that she applied for a position as Principal at Montview Elementary, and was not selected, as well as for

position for which plaintiff had applied.[9]  The Board hired Susan Moon[10] for the only

high school Assistant Principal vacancy that arose while the job posting was in

force.[11]  Ms. Moon had prior experience as an Assistant Principal.[12]  Plaintiff applied

for another Assistant Principal opening in October of 2012,[13] but Shannon Brown was

selected on November 26th.[14] Although plaintiff noted her failure to be selected for

any of the foregoing positions in her complaint, she testified in deposition that she did

not contend that defendant's rejection of her applications was discriminatory or

retaliatory.[15]

## B.  First Parental Complaint

In February of 2013, Huntsville Middle School Principal Aaron King received

a complaint *via* an electronic mail ("email") message transmitted by Ralph Douglas,

the father of one of plaintiff's students.[16]  Mr. Douglas complained that plaintiff had

---

another Principal position during this time period.  However, the computer-generated document
submitted by defendant entitled "Applied Jobs – Lashonda Brown" does not list those positions as
ones for which she applied during that timeframe.  It appears, however, that she applied for a
Principal position at Montview Elementary during July of 2009.  Doc. no. 15-4 (Exhibit A to Debord
Affidavit), at ECF 10.

[9] Doc. no. 15-4 (Debord Affidavit) ¶ 5.

[10] Ms. Moon's race is not identified in the record.

[11] Doc. no. 15-5 (Drake Affidavit) ¶ 4.

[12] *Id.*

[13] Doc. no. 15-4 (Exhibit A to Debord Affidavit), at ECF 10.

[14] Doc. no. 15-4 (Debord Affidavit) ¶ 7.  Ms. Brown's race is not identified.

[15] Doc. no. 15-1 (Plaintiff's Deposition), at 56.

[16] Doc. no. 15-1 (Exhibit 13 to Plaintiff's Deposition), at ECF 124.

treated his son in a rude and unprofessional manner by: refusing to let him have a tissue; refusing to help him when he raised his hand for assistance; making off-color comments about the sexuality of other staff and her own bra size; and, threatening to send his son to "in-school suspension" for raising his hand in class.[17] After plaintiff learned of the complaint, she placed a telephone call to Mr. Douglas at his workplace (the "Olive Garden Restaurant"), and asked him, in what Mr. Douglas later described as a rude tone, to come to the school for a conference.[18] Principal Aaron King and plaintiff met with Mr. Douglas on February 22, 2013, to discuss the complaint.[19] During the meeting, plaintiff confirmed that at least some of the allegations were true.[20] As a result, Mr. King reprimanded her in writing on February 26, 2013, and also noted that her demeanor during the February 22nd conference with Mr. Douglas had been unprofessional.[21]

That same day, plaintiff called Mr. Douglas's supervisor at the Olive Garden Restaurant, and suggested that Mr. Douglas was "stealing" from the restaurant by providing free food to the Huntsville Middle School football team and others

---

[17] *Id.*
[18] *Id.* at ECF 125.
[19] *Id.* at ECF 121.
[20] *Id.* at ECF 121-22.
[21] *Id.* at ECF 121-23.

(including herself).[22]  The restaurant supervisor reiterated plaintiff's allegations to Mr. Douglas, who explained that he had lodged a complaint about plaintiff's treatment of his son with the Middle School Principal.  Mr. Douglas's supervisor then returned plaintiff's telephone call, and explained to her that he had approved the donation of food to the football team, and that all of the other donations attributed to Mr. Douglas had been recorded on the restaurant's "donation log."[23]

Mr. Douglas disclosed the foregoing series of events in another email to Principal King, who in turn asked plaintiff to respond, in writing, to the following questions:

> 1) On February 26, 2013, why did you contact the Olive Garden restaurant and question their general manager, Mr. David Price, about the donations that Mr. Douglas has helped them make to Huntsville Middle School?
>
> 2) What led you to inquire about donations made to the Huntsville Middle School Football team three months after the season ended?
>
> 3) Under whose authority did you act in questioning a Huntsville Middle School donor about donations made to the school?
>
> 4) If you have reason to believe some wrongdoing has been done, why did you not bring this to my attention, since I am the Huntsville Middle School principal?

Doc. no. 15-7 (Exhibit B to King Affidavit), at ECF 24.  Plaintiff initially responded

---

[22] Doc. no. 15-1 (Exhibit 14 to Plaintiff's Deposition), at ECF 132.

[23] *Id.*

to Mr. King on February 27, 2013, saying:

> The conversation I had with Mr. Price did not involve Huntsville Middle
> School and was made after school hours. The conversation I had with
> Mr. Price was privledged [*sic*]. I was not acting as an agent or on behalf
> of Huntsville Middle School.

Doc. no. 15-7 (Exhibit B to King Affidavit), at ECF 25. Plaintiff transmitted a second

email to Mr. King the following day, saying:

> As stated in my email on yesterday my phone call to Mr. Price was
> privileged and I was inquiring about HSV Middle School donations and
> I was not acting on behalf of HMS during the call. Since it was not the
> case that I was not acting [*sic*] as an agent of HMS can I reply to your
> questions on Wednesday, March 6th after I speak with Mr. Cheatham
> [*sic*].

*Id*. at ECF 24. (The "Mr. Cheathem" to whom plaintiff referred was the local

representative of the Alabama Education Association, a statewide professional

organization that represents public school employees in the state.[24])

Following plaintiff's responses, Principal King issued another written

reprimand on March 21, 2013, stating:

> Despite your statement to the contrary, I have documentation
> which shows that your conversation with Mr. Price did involve
> Huntsville Middle School and the donations of one of our community
> partners, Olive Garden. Even though you claim that you were not acting
> as an agent of the school, employees of the school district who call
> others concerning school matters are presumed to be acting in an official

---

[24]*See* doc. no. 15-1 (Exhibit 12 to Plaintiff's Deposition), at ECF 115 (EEOC Charge filed
Apr. 30, 2013, and identifying Rex Cheatham [*sic*] as "Uniserv Director of Alabama Education
Associates [*sic*]"). *See also* myaea.org.

manner. If you had reason to believe that there was impropriety or wrongdoing in the donations that Mr. Douglas facilitated on behalf of the Olive Garden Restaurant to Huntsville Middle School then you should have brought that to my attention. Instead you took it upon yourself to call the restaurant manager, accuse one of his employees (who also happens to be one of our parents) of an ethics violation, and embarrass the school.

Your contact with Mr. Price was unprofessional and retaliatory against Mr. Douglas. Mr. Douglas and the company he represents are excellent advocates for the school and we appreciate their work in support of the Huntsville Middle School clubs and teams. Your actions show a pattern of unprofessional behavior. You are directed to cease contact with all Huntsville Middle School community sponsors and donors with regard to school business unless you have prior written approval from me to do so.

Doc. no. 15-7 (Exhibit C to King Affidavit), at ECF 29.

Notably, plaintiff claimed during her deposition that Mr. Douglas's complaint had not been prompted by her treatment of his son, but that it actually had been motivated by her rejection of his request for a "date."[25]

Around the time of the events described above, a team from the School Board's Department of Instruction conducted a "walkthrough" to observe the performance of Huntsville Middle School teachers in the classroom.[26] Edith Pickens, Director of Secondary Education and a member of the team, sent an email to Principal King on February 27, 2013, discussing some of the team members' observations during the

---

[25] Doc. no. 15-1 (Plaintiff's Deposition), at 132-33.
[26] Doc. no. 15-7 (Exhibit E to King Affidavit), at ECF 37-38.

9

walkthrough.[27]  She specifically singled out plaintiff's demeanor with students for criticism.[28]  She wrote that plaintiff had been

> observed by several people.  All noted that her tone with students was not acceptable.  "Tone was caustic."  She lectured the entire time she was observed.  The students had their computers out and she would ask a question.  Students were supposed to look for their answer on google to answer her questions.  There was a pacing problem with this activity, although the activity itself sounds questionable.  Also, the information on the board was wrong.  A student commented on this and showed the teacher that it was wrong.  Even though the student remained very respectful, the teacher was "very sarcastic to the student."  "Teacher tone was harsh."

Doc. no. 15-7 (Exhibit E to King Affidavit), at ECF 38.  It does not appear that plaintiff was counseled about the foregoing observations;[29] but, as will be discussed below, a subsequent reprimand was based, at least in part, on Ms. Pickens's email.

## C.    Plaintiff's First EEOC Charge

Shortly after receiving Principal King's February 26, 2013 reprimand, plaintiff filed a charge of discrimination with the EEOC, alleging that she had been subjected to race discrimination and harassment.[30]  She alleged that Principal King had:

---

[27] *Id.* at ECF 38.

[28] *Id.*

[29] Doc. no. 15-1 (Plaintiff's Deposition), at 244-45.

[30] Doc. no. 15-1 (Exhibit 12 to Plaintiff's Deposition), at ECF 114.  Plaintiff testified in deposition that she filed a charge of discrimination with the EEOC on March 8, 2013.  *See* doc. no. 15-1 (Plaintiff's Deposition), at 192.  That charge is not contained in the record.  Even so, a charge dated March 23, 2013, bearing the charge number referenced in plaintiff's testimony, and containing the same allegations to which plaintiff testified, was filed as doc. no. 15-1 (Exhibit 12 to Plaintiff's Deposition), at ECF 114.  The EEOC sent notice of the initial charge to the defendant on March 18,

questioned her failure to wear school colors on "dress down Friday"; telephoned her part-time employer to inquire whether a substitute could be engaged, in order to enable plaintiff to attend Huntsville Middle School's open house; failed to respond to her request for information about the Teachers on Special Assignment ("TOSA") program;[31] and, did not approve her request to be late for work in order to attend a medical appointment.[32] Notably, plaintiff did not include the February 26th reprimand as a basis for her claims of race discrimination and harassment.

The so-called "Teachers on Special Assignment ('TOSA') program" is a means of selecting teachers who lack prior administrative experience to serve in such positions, in order to groom the participants for Assistant Principal and Principal positions.[33] There is no *formal* application process; instead, candidates normally are nominated by their Principal or another administrator.[34] Teachers who are nominated

---

2013, with the following notation: "A perfected charge (EEOC Form 5) will be mailed to you once it has been received from the Charging Party." *Id.* at ECF 113. That notice was received in the Superintendent's Office on March 25, 2013. *Id.* Based upon the foregoing circumstantial facts, it appears that plaintiff may have failed to sign and date her original charge, that it was returned to her by the EEOC, and that she re-submitted it to the EEOC on March 23, 2013.

[31] Principal King acknowledged that plaintiff sent him an email on February 11, 2013, asking for "some information regarding the TOSA program offered by Huntsville City Schools." Doc. no. 15-7 (King Affidavit) ¶ 29. At that time, the program had not yet been formally approved by the Superintendent, and Principal King did not have information to provide to plaintiff. *Id.* Accordingly, he forwarded the message to Dr. Cathy Vasile, Director of Elementary Education; and, when he received information about the program, he forwarded it to plaintiff. *Id.*

[32] Doc. no. 15-1 (Exhibit 12 to Plaintiff's Deposition), at ECF 114.

[33] Doc. no. 15-4 (Debord Affidavit) ¶ 17.

[34] *Id.*

for the program must hold an earned bachelor's degree, have accumulated a minimum of five years teaching experience, and have demonstrated "a proven [record of] academic achievement in the classroom."[35]  An "administrative certificate" is not *required* for the position.[36]  Even though plaintiff requested information prior to the implementation of the TOSA program, she did not request Principal King to nominate or recommend her for the program.[37]  In contrast, another Huntsville Middle School teacher, Stephanie Wieseman, specifically asked Principal King to recommend her for the program.  He did so, and she was selected.[38]

Five white and four black teachers were selected for the TOSA program during the 2012-13 school year.[39]  Nine white and six black teachers were selected during the 2013-14 school year.[40]  Dr. Barbara Cooper, the School System's Deputy Superintendent and an African-American female, participated in the selection process during the 2013-14 school year.  She testified that she selected candidates based upon their qualifications and interviews,[41] and that she did not believe that plaintiff, even

---

[35] Doc. no. 15-9 (Simmons Affidavit) ¶ 7 (alteration supplied).

[36] *Id.*

[37] Doc. no. 15-7 (King Affidavit) ¶ 27.

[38] *Id.*; *see* doc. no. 15-4 (Debord Affidavit) ¶ 12 (stating that Ms. Wieseman, "who was selected as Principal of Huntsville Middle School [in February 2015], was previously a TOSA.") (alteration supplied).

[39] Doc. no. 15-4 (Debord Affidavit) ¶ 9.

[40] *Id.*

[41] Doc. no. 15-3 (Cooper Affidavit) ¶ 9.

if she had been nominated, would have been a strong candidate for a TOSA appointment, or any other administrative position.[42]

## D.    Other Administrative Position Applications

Plaintiff applied for the positions of Principal and Curriculum Specialist during April of 2013,[43] but was not selected for either. Paula Cox, an Assistant Principal at another school, was hired for the vacant Principal position on July 15, 2013.[44] There is no indication in the record whether a selection for the Curriculum Specialist position was made.

## E.    Plaintiff's Second EEOC Charge

Plaintiff filed a second EEOC charge on April 28, 2013, and alleged that her March 21, 2013 reprimand had been imposed in retaliation for filing a discrimination complaint with "the HEA": *i.e.*, the Huntsville Education Association, the local chapter of the Alabama Education Association.[45] Plaintiff did not allege that she had been discriminated against on the basis of race.[46] The EEOC dismissed both the present charge and the charge filed during March of 2013 (and discussed in Part II.C,

---

[42] *Id.* ¶ 6.

[43] Doc. no. 15-4 (Exhibit A to Debord Affidavit), at ECF 10.

[44] Doc. no. 15-4 (Debord Affidavit) ¶ 8.

[45] Doc. no. 15-1 (Exhibit 12 to Plaintiff's Deposition), at ECF 115. *See* https://hsvedu.com/ and http://www.myaea.org/ (both last visited Feb. 8, 2018).

[46] *Id.*

*supra*) on July 30, 2013, and issued notices of plaintiff's right to sue.[47]  However, plaintiff did not subsequently file actions based upon either EEOC charge within the time allowed by law.

**F**.    **Additional Criticism of Plaintiff's Performance**

Assistant Principal Richard Jernigan conducted a routine "walk-through" on April 1, 2013, during which he observed plaintiff's class.  He later noted that she: arrived to the classroom late, after the bell signaling the beginning of the instructional period; did not post the objectives for the day on the blackboard; sat at her desk while the students worked; did not respond to a student's request for clarification; and, did not engage the students.[48]  Plaintiff was not then counseled about those shortcomings; but, as will be discussed below, they later were used as justification for a reprimand.[49]

During the same month, Principal Aaron King also received complaints from a parent of one of plaintiff's students.[50]  The concerns included assertions that plaintiff:  made personal telephone calls during class; often was absent from the

---

[47] Doc. no. 15-1 (Exhibit 12 to Plaintiff's Deposition), at ECF 119, 120.

[48] These statements are quoted in the reprimand issued to plaintiff by Principal King on May 10, 2013, but do not appear in an independent document in the record.  *See* doc. no. 15-7 (Exhibit F to King Affidavit), at ECF 43-44.

[49] Doc. no. 15-1 (Plaintiff's Deposition), at 215-16.

[50] *Id.* at 138.

14

classroom; left medication in plain view on her desk; and, was rude to students.[51]

Principal King met with plaintiff to discuss the complaint on April 25, 2013, and met jointly with the complaining parent, Assistant Principal Richard Jernigan, and plaintiff five days later. He also met with two of plaintiff's students, and asked them to write statements about their social studies class. One student wrote:

> We are not allowed to talk before the bell rings. Mrs. Brown never presents anything on the board. When we have a substitute if one person gets in trouble we are all punished. We are not allowed to use the hall passes for anything. She takes medication during class. When we raise our hands she will say "why do you have your hand up."

Doc. no. 15-7 (Exhibit F to King Affidavit), at ECF 43-44. The second student said that:

> Ms. Brown is not really fair. Like she has a bad attitude even when we respect her she still has a bad attitude [*sic*]. Like for example [name redacted in original] had to use the bathroom and she wouldn't let him use it so he walked out and she wrote him up. She punishes the whole 5th period class for one's mistakes. And she doesn't repeat direction if we don't hear her. So she doesn't really teach.

*Id.*

Based upon Principal King's meeting with plaintiff and the complaining parent, the April 2013 "walkthrough" observations of Assistant Principal Jernigan, the foregoing student statements, and the February 2013 observations recorded by Edith

---

[51] Doc. no. 15-7 (Exhibit D to King Affidavit), at ECF 34; *id.* (Exhibit F to King Affidavit), at ECF 40-45.

Pickens, Director of Secondary Education and a member of the School Board's Department of Instruction "walkthrough" team (see Part II.B, *supra*), Mr. King issued a written reprimand to plaintiff on May 10, 2013. He stated, in part, that "it is apparent that [plaintiff's] conduct in the classroom toward the students is adversarial and inappropriate."[52] He concluded that, "despite direction to the contrary, you have continued to treat the students with contempt and have acted unprofessionally."[53]

Later that same day, plaintiff lodged a grievance against Principal King with Belinda Williams, the School Board's Compliance Director.[54] She listed the reasons for her grievance as follows:

1) Attacks on my personal character and professional character
2) Three letters of reprimand without documentation
3) Excessive classroom observations
4) Hindrance to professional growth
5) Denying requests for me but allowing others to perform similar requests
6) Negative and condescending emails
7) Lack of professional courtesy and respect
8) Lack of conferences addressing "unprofessional" behavior, parents [*sic*] concerns and concerns submitted by Mrs. Edith Pickens

Doc. no. 15-10 (Exhibit A to Williams Affidavit), at ECF 5. Plaintiff also alleged:

Aaron King has performed discriminatory acts against me while serving as my supervisor. He has refused requests submitted by me

[52] Doc. no. 15-7 (Exhibit F to King Affidavit), at ECF 44 (alteration supplied).

[53] *Id.*

[54] Doc. no. 15-10 (Exhibit A to Williams Affidavit), at ECF 5.

while allowing others to perform similar requests. Currently, I have two EEOC complaints filed regarding the discrimination I have faced during the 2012-2013 academic school year. I have received three letters of reprimand from Mr. Aaron King. All letters are based on the emotions and statements of others. No factual data has been submitted to validate any of the concerns mentioned in the reprimand letters. There are no collaborating witnesses but month after month I am called into the conference room, given the reprimand letters and each letter has been placed in my file. I have filed a complaint with the Huntsville Education Association, and the Equal Employment Opportunity Commission regarding the constant harassment disseminated by Aaron King, my immediate supervisor. As an employee, I have not been given an opportunity to conference with Aaron King regarding any of the concerns in the letter or concerns submitted by parents. No corrective action has been offered or administered. I have explained, repeatedly, to Aaron King that the statements in the letters are inaccurate and grossly overstated. His response each time is, "You have the opportunity to rebuttal." Aaron King does not regard me as a professional and an expert in my field and this is clearly exhibited in the acts of harassment and discrimination I have endured during the school year.

*Id*. at ECF 5-6. Ms. Williams investigated the complaint by interviewing plaintiff, Principal King, and approximately ten other witnesses.[55] Her response to plaintiff's complaint concluded that there was "no harassment against you by Mr. King. No further action is required at this time." Doc. no. 15-10 (Exhibit B to Williams Affidavit), at ECF 8.

Plaintiff took approved leave for health reasons on May 13, 2013 — nine days before the end of the school year — and remained on leave until the conclusion of

_____

[55] Doc. no. 15-10 (Williams Affidavit) ¶ 5.

that academic year.[56] Plaintiff did not submit lesson plans for the remainder of the year before taking leave, however, and Principal King asked Assistant Principal Jernigan to audit plaintiff's lesson plans, to determine which of the required Alabama Course of Study standards needed to be met during the remaining nine days of the school term.[57] In doing so, Mr. Jernigan discovered that plaintiff had not taught four standards relating to the seventh-grade citizenship class, three standards relating to the seventh-grade geography class, and five standards relating to the eighth-grade world history class.[58] His review of plaintiff's lesson plans also revealed that she taught the same world history standard from September 24 through December 7, 2013, and that she continued to teach that standard, along with other standards, until April 5, 2013.[59] Apparently, lesson plans documenting the standards to be taught were to be submitted weekly by each teacher,[60] but it is not clear from the record to whom the plans were to be delivered. In any event, it is clear (and, to say the least, troubling) that plaintiff's lesson plans were not reviewed by anyone within the school's administration until an issue arose as a result of her approved medical leave.

On June 24, 2013, following Assistant Principal Jernigan's review, Principal

---

[56] Doc. no. 15-7 (King Affidavit) ¶ 16.

[57] *Id.*

[58] *Id.* ¶¶ 17-21.

[59] *Id.* ¶ 23.

[60] Doc. no. 15-7 (Exhibit G to King Affidavit), at ECF 47-51.

King issued another written reprimand to plaintiff, listing the deficiencies noted above, and stating that, "for the week of October 1, 2012 through October 5, 2012[,] you submitted an 8th grade World History lesson plan with 8th grade World History standards as the lesson plan for 7th Grade Citizenship class that you teach."[61] He also faulted plaintiff for failing to turn in a grade book for the year,[62] which she denied.[63]

## G. Plaintiff's Third EEOC Charge

Plaintiff filed a third charge with the EEOC on June 20, 2013, alleging retaliation based upon the May 10, 2013 reprimand discussed in Part II.F, *supra*. She stated, in part, that she had not been accorded "an opportunity to respond," and that the disciplinary action was in retaliation for her act of filing "a charge of discrimination with EEOC."[64] The charge was investigated by the EEOC, and a dismissal and notice of plaintiff's right to sue was issued on September 25, 2013.[65] Plaintiff did not file an action in district court within the statutory ninety-day period.

## H. Plaintiff's Fourth EEOC Charge

Plaintiff filed a fourth charge of discrimination with the EEOC on July 22, 2013, alleging that the June 24, 2013 reprimand had been issued in retaliation for her

---

[61] *Id.* at ECF 49 (alteration supplied).

[62] *Id.* at ECF 51.

[63] Doc. no. 15-1 (Exhibit 18 to Plaintiff's Deposition), at ECF 150.

[64] *Id*. (Exhibit 15 to Plaintiff's Deposition), at ECF 133.

[65] *Id.* at ECF 137.

previous EEOC charges.[66]  The charge was investigated by the EEOC, and a dismissal and notice of rights was issued on February 24, 2014.[67]  Again, plaintiff failed to file a lawsuit within the statutory ninety-day period.

## I.    Plaintiff's Transfer to Butler High School

Sometime during July of 2013, plaintiff met with the Superintendent of the City School System, Dr. Casey Wardynski, Huntsville Education Association President Shirley Wellington, AEA Uniserv Director Rex Cheatham, Principal Aaron King, and Assistant Principal Richard Jernigan to discuss her dissatisfaction with her treatment at Huntsville Middle School.[68]  In the course of the meeting, she asked to be transferred to another school during the forthcoming academic year.[69]  The day after that conference, plaintiff received a telephone call from Edith Pickens, Director of Secondary Education, who informed plaintiff that the only position available was located at Butler High School.[70]  Plaintiff reluctantly accepted the transfer.[71]

Butler High School was permanently closed at the conclusion of the 2014-15 academic year, and plaintiff then was reassigned to Grissom High School for the

---

[66] Doc. no. 15-1 (Exhibit 18 to Plaintiff's Deposition), at ECF 150.

[67] *Id.* at ECF 155.

[68] Doc. no. 15-1 (Plaintiff's Deposition), at 39.

[69] *Id.*

[70] *Id.*

[71] *Id.* at 49.

2015-16 school year.[72]  She taught there only briefly, until November of 2015, when she resigned in order to accept a position as a Principal in the Giles County, Tennessee, school system.[73]

## J.  Plaintiff's Fifth EEOC Charge

Plaintiff filed a fifth EEOC charge on August 26, 2013, alleging that she was not selected as a "TOSA" because of her race, and in retaliation for her previous EEOC charges.[74]  A dismissal and notice of right to sue was issued on February 24, 2014, but — yet again — she did not file an action in federal court within the time allowed by law.[75]

## K.  Plaintiff's Sixth (and Final) EEOC Charge

Plaintiff's final EEOC charge was filed on November 6, 2015, and alleged that, during May of 2015, she had applied for the positions of Assistant Principal, Turnaround Specialist, and Dean of Students, but she had not been interviewed or selected for any of those positions because of her race, and in retaliation for her previous EEOC charges.[76]  The EEOC issued a dismissal and notice of right to sue

---

[72] *Id.* at 80-81.

[73] *Id.* at 22-23.

[74] Doc. no. 15-1 (Exhibit 19 to Plaintiff's Deposition), at ECF 156.

[75] *Id.* at ECF 160.

[76] Doc. no. 15-1 (Exhibit 11 to Plaintiff's Deposition), at ECF 111.

on April 26, 2016.[77]  Plaintiff commenced this action exactly ninety days later, on

July 25, 2016.[78]

## III.  ANALYSIS

### A.  Title VII Administrative Prerequisites

A plaintiff must satisfy a number of administrative prerequisites before filing

a suit based upon Title VII of the Civil Rights Act of 1964.  Relevant here is the Act's

requirement that, within ninety days after the EEOC issues notice of a complainant's

right to sue, "a civil action may be brought against the respondent named in the

charge."  42 U.S.C. § 2000e-5(f)(1).  While plaintiff timely filed six charges with the

EEOC based upon perceived race discrimination and retaliation,[79] she did not file an

action in federal court for any but the final charge.  Accordingly, only the allegations

contained therein are at issue.  Specifically, plaintiff alleged that:

> On May 18, 2015, I applied for the positions of Assistant
> Principal, Turnaround Specialist and Dean of Students with the
> Huntsville City Board of Education.  The Board never contacted me for
> an interview.
>
> I am an African-American female.  The Board hired white
> employees for those positions.  I believe that the Board's refusal to hire
> me for those positions was race discrimination and/or retaliation for my

---

[77] *Id.* at ECF 112.

[78] Doc. no. 1 (Complaint).

[79] Charges of discrimination must be filed with the EEOC within 180 days of the alleged
unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).

filing of an EEOC charge against the Board.

Doc. no. 15-1 (Exhibit 11 to Plaintiff's Deposition), at ECF 111.

Plaintiff's complaint also referred to applications she made for the positions of Principal and Curriculum Specialist during 2015. The court will not consider those allegations, however, as they are beyond the scope of her final EEOC charge, and were not investigated by that administrative agency. *See, e.g., Clark v. City of Macon, Georgia*, 860 F. Supp.1545, 1551 (M.D. Ga. 1994) ("Congress wanted the EEOC to have an opportunity to investigate and attempt conciliation of all claims before litigation was brought."). While more leniency generally is afforded to EEOC charges and federal judicial complaints drafted by laypersons such as plaintiff, acting without the aid of counsel, consideration of allegations related to two additional positions for which she applied is not warranted. Plaintiff is well educated, and she had filed five previous EEOC charges. Her deposition testimony illustrates that she was familiar with the process for attempting to redress her grievances, and that she consulted at least one attorney.[80]

**B**.    **Title VII Claim for Failure to Promote**

Plaintiff must establish four elements in order to state a *prima facie* claim:  (1) she is a member of a class of persons protected by Title VII; (2) she applied for, and

---

[80] *See* doc. no. 15-1 (Plaintiff's Deposition), at 202-04.

23

was qualified to fill, a position for which the employer was accepting applications; (3) despite her qualifications, she was rejected for promotion to the position; and (4) after her rejection, the employer *either* kept the position open, *or* filled it with a person outside plaintiff's protected class. *See, e.g.*, *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185–93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of the relative qualification of the person promoted instead of plaintiff as part of a *prima facie* case for failure-to-promote); *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980).[81]  "Once the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767-68 (2005) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Plaintiff then may show that the reason offered by the employer is a pretext for discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

When a plaintiff shoulders those evidentiary burdens, the employer may be found liable for intentional discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147 (2000).

---

[81] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

### 1. Assistant Principal

Plaintiff has established that she is a member of a protected class (African-American), that she applied for and was qualified for the Assistant Principal position, and that she was not selected for the promotion. Plaintiff has not, however, satisfied the final element: *i.e.,* that an individual outside her protected class was promoted. Defendant has provided evidence that no vacancies occurred for Assistant Principal while the posting was active and, thus, no selections were made.[82] As such, plaintiff cannot establish a *prima facie* case of race discrimination with respect to this position, and her claim under Title VII must be denied.

### 2. Turnaround Specialist

Plaintiff also has established the first three elements of a *prima facie* case for the Turnaround Specialist position. With regard to the final element, the record indicates that there were 186 applicants for the Turnaround Specialist position, and that Mark Mincher, Talent Management Coordinator, reviewed the applications. Following his review, he referred four finalists to Paula Thompson, Principal of Westlawn Middle School, where the vacancy existed, to complete the selection process. Crystal Alexander, a white female, was selected.[83] Accordingly, plaintiff

---

[82] Doc. no. 15-4 (Debord Affidavit) ¶ 10.

[83] *Id.* ¶ 14; doc. no. 15-9 (Simmons Affidavit) ¶¶ 18-19.

has established a *prima facie* racially-discriminatory failure-to-promote claim. Thus, it is incumbent upon the Board to offer a legitimate, non-discriminatory reason to explain why plaintiff was not selected for the position.

There is no indication that Mark Mincher knew the race of any of the 186 applicants he reviewed. Plaintiff was not selected as one of the four finalists out of the applicant pool and, thus, was not referred for an interview with the Principal of the school where the opening existed. That constitutes a legitimate, non-discriminatory reason. Plaintiff has not provided any evidence to cast doubt upon the defendant's explanation — *i.e.*, that Mark Mincher, the person who eliminated plaintiff (as well as 181 other applicants) from further consideration, did not know the race of any applicant. Thus, her claim must fail.

### 3. Dean of Students

Plaintiff again established the first three elements of a *prima facie* case for the position of Dean of Students. Defendant has presented evidence that there were forty-nine applicants for the Dean of Students vacancy. The applications were reviewed by Christie Finley, Director of Secondary Education. Four finalists were selected to be interviewed, three of whom were African-American. The finalists were interviewed by Finley and Tammy Summerville, Director of Magnet Programs, who also is an African-American female. Based upon the interviews, Finley and

Summerville selected Antony Woods, an African-American male. Because the individual selected for the position was a member of plaintiff's protected race, she cannot establish the fourth element of the *prima facie* case, and her Title VII claim for failure-to-promote with respect to this position must be denied.

**C**.   **Title VII Retaliation**

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000). Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (alteration and ellipsis supplied). Congress thus recognized two predicates for retaliation claims: one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc*., 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted).

The filing of a formal charge of discrimination with the EEOC clearly is protected under the "participation clause." *See, e.g., Berman v. Orkin Exterminating Co*., 160 F.3d 697, 702 (11th Cir. 1998). That clause protects actions and statements that "occur in conjunction with or after the filing of a formal charge with the EEOC." *Total System Services, Inc.*, 221 F.3d at 1174 (citation and footnote omitted). Plaintiff clearly met that burden by filing six charges of discrimination with the EEOC.

In addition to showing that she participated in protected activity, a plaintiff must establish that she suffered an adverse employment action, and that the adverse employment action was causally related to the protected activity. *See, e.g., Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012). "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Kidd v. Mando American Corp*, 731 F.3d 1196, 1210 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

The Supreme Court has observed that the temporal gap between the protected activity and the alleged adverse employment action must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for the proposition that three- and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[84]   Here, plaintiff has shown neither temporal proximity, nor that the decisionmakers were aware that she had engaged in protected activity.   First, she had not filed a charge with the EEOC since August 26, 2013, prior to applying for the positions of Assistant Principal, Turnaround Specialist, and Dean of Students during May of 2015: a

---

[84] In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).   *See e.g., Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).   Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268 (2001) (*per curiam*).

temporal gap of one year and eight months. Second, plaintiff has not established that any of the decisionmakers involved in the selections for the positions for which she applied were aware that she had filed charges of discrimination with the EEOC. Indeed, the evidence of record demonstrates the contrary.[85] Hence, plaintiff's Title VII retaliation claims must be dismissed.

## D. Racially Discriminatory Failure-to-Promote Claim Under 42 U.S.C. § 1981

42 U.S.C. § 1983 "contains the sole cause of action against state actors for violations of § 1981." *Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000). Here, plaintiff's complaint *mentioned* 42 U.S.C. § 1983 under the heading "Jurisdiction and Venue," but she based her claim in Count III for racially discriminatory failure-to-promote solely upon 42 U.S.C. § 1981. While plaintiff technically may not have properly framed the statutory bases for her claim, the court finds the complaint to be sufficient to allow consideration of her race-based failure-to-promote claim.[86] First, however, the court must determine which of plaintiff's allegations, other than those already dismissed in the context of Title VII, are at issue.

### 1. Section 1981 statute of limitations

Section 1981, like many other federal statutes (*e.g.*, 42 U.S.C. §§ 1982, 1983),

---

[85] Doc. no. 15-6 (Finley Affidavit) ¶ 6; doc. no. 15-8 (Mincher Affidavit) ¶ 4.

[86] The Board did not raise this deficiency.

does not contain a specific statute of limitations. In such circumstances,[87] the Supreme Court traditionally has instructed district courts to "select the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987). In Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (citing Alabama Code § 6-2-38(l) for the proposition that § 1981 claims arising out of acts occurring in Alabama are governed by the state's general, two-year limitations period); *cf. Goodman*, 482 U.S. at 661-64 (holding that the court of appeals correctly applied Pennsylvania's two-year statute of limitations for personal injury actions to § 1981 claims).

ThatS general rule was limited to some extent on December 1, 1990, when Congress created a "catchall" four-year statute of limitations that applies to civil actions arising under federal statutes enacted after the effective date of that statute, but not containing a specific statute of limitations. *See* 28 U.S.C. § 1658; *see also North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (describing § 1658 as providing "a general, 4-year limitations period for any federal statute *subsequently enacted* without one of its own") (emphasis supplied). Precisely, the statute states

---

[87] The Supreme Court has described Congress' frequent failure to enact specific statutes of limitation as a "void which is commonplace in federal statutory law." *Board of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).

that, "[e]xcept as otherwise provided by law, a civil action arising under *an Act of Congress enacted after the date of the enactment of this section* may not be commenced later than 4 years after the cause of action accrues."  28 U.S.C. § 1658(a) (alteration and emphasis supplied).[88]

Thus, a question can arise as to which tolling provision applies to claims asserted under 42 U.S.C. § 1981:  the two-year limitation period borrowed from Alabama law, or the four-year period prescribed by 28 U.S.C. § 1658(a).[89]

### a.    The language of § 1981 prior to the Civil Rights Act of 1991

The statutory language now codified at 42 U.S.C. § 1981(a) was originally enacted as part of the Civil Rights Act of 1866.  It was amended in minor respects in 1870, and recodified in 1874.  *See Runyon v. McCrary*, 427 U.S. 160, 168-69 n.8 (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436-37 (1968).  Congress most recently amended the statute in 1991.  Prior to that year, § 1981 contained only one

---

[88] Congress amended § 1658 in 2002, to add a separate provision (designated subsection (b)) specifying the statute of limitations for certain claims under the securities laws.  *See* Corporate and Criminal Fraud Accountability Act of 2002, Pub. L. 107-204, § 804(a), 116 Stat. 801.  The original language of § 1658 quoted above was not changed, but re-designated subsection (a).

[89] Here, an additional wrinkle is that, because the Board is a state actor, plaintiff must proceed through the vehicle of 42 U.S.C. § 1983, which is subject to the two-year limitations period borrowed from Alabama law.  *See Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989).  The Eleventh Circuit addressed the interaction of sections 1981 and 1983 with respect to the statute of limitations issue, however, in *Baker v. Birmingham Board of Education*, 531 F.3d 1336 (11th Cir. 2008), holding that for claims *made possible by the 1991 amendment* to § 1981, the four-year statute of limitations of § 1658(a) applies, rather than the two-year limitations period for § 1983.  *Id.* at 1338.  By extension, then, the two-year limitations period applies to claims that were cognizable *prior to* the amendment of § 1981.

paragraph, reading as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The Supreme Court interpreted the original language of § 1981 narrowly in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), holding that it did not protect against racial harassment or other discriminatory conduct that occurred after the formation of the contract of employment. *See id*. at 171 (holding that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations"). Instead, the statute was construed as only "prohibit[ing] racial discrimination in the making and enforcement of private contracts." *Id*. at 172 (alteration supplied).

> The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

*Id.* at 176-77.[90] *See also*, *e.g.*, *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (holding that African American plaintiffs did not enjoy the right to assert hostile work environment, wrongful termination of employment, or failure-to-transfer claims under the pre-1991 version of § 1981); *Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991) (§ 1981 "limited to actions for *refusal to enter into* a contract because of race," and did not apply to race discrimination claims arising *during* a plaintiff's employment) (emphasis in original).

It is important to notice, however, that the *Patterson* Court also held that *some* failure-to-promote claims *were actionable* under the pre-1991 version of § 1981.

> Petitioner's claim that respondent violated § 1981 by failing to promote her, because of race, to a position as an intermediate accounting clerk is a different matter. . . . [T]he question [of] whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. . . . Only where the promotion rises to the level of an opportunity for *a new and distinct relation between the employee and the employer* is such a claim actionable under § 1981. *Cf. Hishon v. King & Spalding*, 467 U.S. 69, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984) (refusal of law firm to accept

---

[90]As the *Patterson* Court noted,

> [i]nterpreting § 1981 to cover postformation conduct unrelated to an employee's right to enforce his or her contract, such as incidents relating to the conditions of employment, is not only inconsistent with that statute's limitation to the making and enforcement of contracts, but would also undermine the detailed and well-crafted procedures for conciliation and resolution of Title VII claims.

*Patterson*, 491 U.S. at 180 (alteration supplied).

associate into partnership) (Title VII).

*Patterson*, 491 U.S. at 185-86 (alterations in original and emphasis supplied).[91]

      **b**.    **The language of § 1981 as amended by the Civil Rights Act of 1991**

Congress overturned the Supreme Court's *Patterson* decision on November 21, 1991, when it enacted the Civil Rights Act of 1991.  *See* Pub. L. No. 102-166, Title I, § 101, 105 Stat. 1071 (1991).  The amendatory Act designated the preexisting text of § 1981 as § 1981(*a*), and added two new subsections.  The first new subsection defined the key phrase "make and enforce contracts" as including "the making, performance, modification, *and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship*." 42 U.S.C.

---

[91] The Eleventh Circuit applied *Patterson's* "new and distinct relation" test in *Wall v. Trust Company of Georgia*, 946 F.2d 805 (11th Cir. 1991).  The African American plaintiff worked for the defendant as a "customer service representative," but applied for the newly-created position of "tax analyst."  *Id.* at 806-07.  The position was instead awarded to a white candidate, and plaintiff sued under both Title VII and § 1981.  *Id.* at 807-08.  The district court entered partial summary judgment in favor of the employer on plaintiff's § 1981 claim, concluding that a promotion from customer service representative to tax analyst did not constitute a "new and distinct contractual relationship."  The Eleventh Circuit affirmed, saying:

> The customer service representative and tax analyst positions are both nonexempt salaried jobs, are relatively equal in grade (118 versus 119), provide identical benefits and compensation, and are covered by the same policies and procedures. *Specifically, the change would not have involved the elevation of* [plaintiff] *to a management position which could be considered a new contract*, analogous to the change in status in *Hishon*, cited by means of example in *Patterson*.

*Wall*, 946 F.2d at 808 (alteration and emphasis supplied) (citations omitted).

§ 1981(b) (emphasis supplied).[92]  The Supreme Court subsequently recognized that the 1991 amendment "enlarged the category of conduct that is subject to § 1981 liability."  *Rivers v. Roadway Express*, 511 U.S. 298, 303 (1994).

Again, it is important to notice that the amendments to § 1981 worked by the Civil Rights Act of 1991 made *all* failure-to-promote claims actionable under the statute — not just those which rose "to the level of an opportunity for *a new and distinct relation between the employee and the employer*."  *Patterson*, 491 U.S. at 185.  *See, e.g., Goodgame v. American Cast Iron Pipe Company*, 75 F.3d 1516, 1518 (11th Cir. 1996) (citing 42 U.S.C. § 1981(b), and holding that the post-1991 amended version of § 1981 is "applicable to all promotion claims").

The Supreme Court addressed the implications of § 1658(a) for § 1981 claims

---

[92] The current version of § 1981 reads as follows:

**(a) Statement of equal rights**.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment**.  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), and concluded that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 — and therefore is governed by § 1658's four-year statute of limitations — if the plaintiff's claim against the defendant *was made possible by a post-1990 enactment*." *Id.* at 1845 (emphasis supplied and alteration in original). Applying that test, the Supreme Court held that the hostile work environment, wrongful termination, and failure-to-transfer claims of the African American plaintiffs in *Jones*

> "ar[ose] under" the 1991 Act *in the sense that petitioners' causes of action were made possible by that Act.* Patterson held that "racial harassment relating to the conditions of employment is not actionable under § 1981." 491 U.S., at 171, 109 S. Ct. 2363 (emphasis added). The 1991 Act overturned *Patterson* by defining the key "make and enforce contracts" language in § 1981 to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In *Rivers v. Roadway Express, Inc.*, we recognized that the 1991 amendment "enlarged the category of conduct that is subject to § 1981 liability," 511 U.S., at 303, 114 S. Ct. 1510, and we therefore held that the amendment does not apply "to a case that arose before it was enacted," *id.*, at 300, 114 S. Ct. 1510. Our reasoning in *Rivers* supports the conclusion that the 1991 Act fully qualifies as "an Act of Congress enacted after [December 1, 1990]" within the meaning of § 1658. *Because petitioners' hostile work environment, wrongful termination, and failure-to-transfer claims did not allege a violation of the pre-1990 version of § 1981 but did allege violations of the amended statute*, those claims "ar[ose] under" the amendment to § 1981 contained in the 1991 Act.

*Jones*, 541 U.S. at 383-84 (alterations in original and emphasis supplied). Thus, even

following the enactment of § 1658, it sometimes becomes important to determine whether a particular plaintiff's claim is one that could have been brought under the pre-1991 version of § 1981, in order to determine the applicable statute of limitations.

Plaintiff's complaint alleges that defendant failed to promote her to the positions of Curriculum Specialist, Principal, TOSA, and Assistant Principal, in violation of § 1981. Count III does not specify the dates on which she applied for each position, but elsewhere in the complaint she alleges that, during the 2012-13 academic year, she "applied for various positions, including, but not limited to, Assistant Principal, Curriculum Specialist, and Principal."[93] Also, she alleges that she applied for a TOSA position around July 23, 2013.[94] Finally, she states that she applied for positions as "Dean of Students, Turnaround Specialist, Assistant Principal, Principal, and Curriculum Specialist" during May of 2015.[95] She filed the complaint on July 25, 2016. Thus, the timeliness of her claims is at issue, and the appropriate limitation period must be determined.

In *Price v. M&H Valve Co.*, 177 F. App'x 1 (11th Cir. 2006), an African-American employee sued his employer under Title VII and § 1981 for failing to promote him to multiple supervisory positions, for retaliation, and for failing to

---

[93] Doc. no. 1 (Complaint) ¶ 9.

[94] *Id.* ¶¶ 17, 18.

[95] *Id.* ¶ 22.

provide him with training opportunities. *Id.* Thus, the plaintiff's failure-to-promote claim would be timely only if the four-year limitation period of § 1658 applied, and the Court of Appeals stated that

> [w]e, therefore, must determine whether [plaintiff's] § 1981 claim was cognizable before the effective date of the four-year "catch-all" statute of limitations under § 1658, and, thus, subject to the two-year limitation period. Under *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), *superseded by statute as stated in Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which applied to § 1981 before the amendments contained in the Civil Rights Act of 1991, a failure-to-promote claim was actionable under § 1981 if the promotion rose "to the level of an opportunity for a new and distinct relation between the employee and the employer." *Id.* at 185, 109 S. Ct. at 2377. Because [plaintiff] was asserting that M & H Valve failed to promote him because of his race, we conclude that his § 1981 claims were cognizable under *Patterson* and, thus, time-barred under Alabama's two-year statute of limitations.

*Id.* at 10 (alterations supplied).

Here, defendant has presented evidence that the positions of Curriculum Specialist, Principal, TOSA, and Assistant Principal for which plaintiff applied would have been promotions that rose to the level of an opportunity for a new and distinct relation with the Board, by virtue of the addition of supervisory duties, higher pay, and a contract providing a ten-month *versus* a nine-month term of employment each year.[96] As such, plaintiff's failure-to-promote claim was cognizable under *Patterson*,

---

[96] Doc. no. 15-4 (Debord Affidavit) ¶¶ 17-20.

and is subject to the two-year limitations period. Therefore, her claim relating to positions for which she applied during the 2012-13 academic year — *i.e.*, Assistant Principal, Principal, Curriculum Specialist, and TOSA — is time-barred.

### 2. The merits of plaintiff's remaining § 1981 failure-to-promote claims

Plaintiff's remaining failure-to-promote claims relate to the positions of Principal and Curriculum Specialist, for which she applied during 2015.[97] Section 1981 failure-to-promote claims are susceptible to the same analysis as those made under Title VII. Section 1981 has been described as "a parallel remedy against [racial] discrimination which . . . derive[s] its legal principles from Title VII." *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979) (alterations and ellipsis supplied)). In other words, because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework, . . . we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (alteration and ellipsis supplied); *see also*, *e.g.*, *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (observing that race discrimination claims brought

---

[97] The posting date for Principal was February 9, 2015, and for Curriculum Specialist it was February 12, 2015. Doc. no. 15-4 (Exhibit A to Debord Affidavit), at ECF 10.

under Title VII and § 1981 "are subject to the same standards of proof and employ the same analytical framework"); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief with section 706 of Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706 [of Title VII, *i.e.*, 42 U.S.C. § 2000e-5]." (alterations supplied and citations omitted)).

The analytical framework applicable to both Title VII and § 1981 claims is the *McDonnell Douglas* burden-shifting framework, described above, which places the burden of establishing a *prima facie* case of race discrimination on the employee. *See*, *e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767-68 (11th Cir. 2005) (describing the elements of "the familiar *McDonnell Douglas* framework").

### a. Principal

As set forth above, plaintiff must establish a *prima facie* case that she was not promoted to the position of Principal on account of her race. She has established the first three elements: that she is a member of a protected class; that she was qualified for the position; and that she was rejected for promotion. She has not established, however, that a person outside her protected group was selected for the position. The Board has presented evidence that eight applicants were selected as Principals in

41

connection with the February 2015 posting.[98]  While they are identified by name in the record, there is no indication of their race.

Even assuming that some or all of those selected for the position of Principal were outside of plaintiff's protected racial class, the Board of Education has offered a legitimate, non-discriminatory reason for failing to select plaintiff for this position: namely, that all of those selected had prior administrative experience.[99]  Plaintiff has not demonstrated that this reason is a pretext for discrimination, and her claim must accordingly be denied.

### b.    Curriculum Specialist

Again, plaintiff's claim for defendant's failure to select her for this promotion boils down to establishing the final element of the *prima facie* case.  The evidence supplied by the Board is this: 222 teachers applied for the position; the applications were screened by the Talent Management Department; twenty-three candidates were interviewed by a committee and referred to the Principal for the school at which there was a position available; and eleven teachers were selected for the Curriculum Specialist position.[100]  Of the eleven selected, six were African American, and five

---

[98] Doc. no. 15-4 (Debord Affidavit) ¶ 12.

[99] *Id.*

[100] Doc. no. 15-9 (Simmons Affidavit) ¶¶ 12-14.

were white.[101] While plaintiff has nominally satisfied the requirement of showing that an individual outside of her protected group was selected for the position, there were more individuals within her protected group selected for the position at issue. That fact, along with the large number of applicants for the position, screened by the Talent Management Department without regard to knowledge of the applicants' race, provides a legitimate, non-discriminatory reason for plaintiff's non-selection for the position of the Curriculum Specialist. Plaintiff cannot show that the selection process as described by the Board was a pretext for discrimination. Accordingly, this claim also must be dismissed.

## IV. CONCLUSION

In accordance with the foregoing discussion, the Board's motion for summary judgment is GRANTED, and it is ORDERED, ADJUDGED, and DECREED that all claims alleged in plaintiff's complaint be, and the same hereby are, DISMISSED with prejudice. Costs are taxed to plaintiff. The Clerk is directed to close this file.

**DONE** and **ORDERED** this 9th day of February, 2018.

_____
United States District Judge

---

[101] *Id.*